UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------         INDEX NO: _____ -

Tequan Doe,

Plaintiff

   V.

The City of New York, Island Rehabilitative Services, Inc., Lenox Hill Hospital,

Joshua Schwimmer, John Doe 1, and John Doe 2 (police officers),

Defendants

------------------------------------------------------------------

# **VERIFIED CIVIL COMPLAINT**

**PARTIES**

Plaintiff Tequan Doe, is a natural person and a citizen of the state of New York. Defendant the City of New York (NYPD) is a  municipality of the State of New York, Defendant Lenox Hill Hospital is a corporation operating in the state of New York, Defendant Joshua Schwimmer alternatively referred to throughout the complaint as "The Doctor," "The Doctor in question" or "This Doctor" or "Schwimmer" is a natural person and medical doctor specializing in nephrology and the Plaintiff's former treating physician. Defendant Island Rehabilitative Services, Inc. is alternatively referred to as "Island" throughout the complaint is a Medicare certified provider of dialysis treatment and is an affiliate of Lenox Hill Hospital and provides dialysis services to the public and the Plaintiff; John Doe 1 and John Doe 2 are police officers employed by the NYPD. Throughout the complaint,  Schwimmer, Island, and Lenox Hill are alternatively collectively referred to as the "Medical Defendants"

**JURISDICTION**

This Court has jurisdiction pursuant to 28 U.S.C. § 1331, This Court has supplemental jurisdiction pursuant to  28 U.S.C. § 1367.

**VENUE**

Venue is proper in accordance with 28 U.S.C. § 1391 as all parties reside and or operate within the City of New York and particularly within the borough of Manhattan where all of the alleged incidents given rise to this suit occurred and the borough of Manhattan falls within the jurisdictional territory of the Southern District of New York.

## PRELIMINARY STATEMENT OF THE FACTS

Plaintiff is a natural person who suffers from End Stage Renal Disease (ESRD).

Plaintiff has been regularly receiving dialysis treatments since December of 2021 the vast majority of which had been performed by Island Rehabilitative Services.

On or about June 30th 2022, sometime between the hours of 10 am and 12 noon the New York City Police Department (NYPD) entered said premises for the express purpose of making contact with the Petitioner.

The Plaintiff was unaware of the purpose of the NYPD's approach to his domicile at the time.

During this time two officers of  the NYPD repeatedly banged on the petitioner's door for somewhere between the span of 2-3 hours causing the door to tremble and vibrations from the officer's knocks to reverberate throughout the Plaintiff's apartment hallway.

The Petitioner fearing that the NYPD came to his home to arrest him retreated to his bedroom and had silently resolved not to open the door for the officers as neither of the officers announced with any specificity the purpose of their visit , shortly thereafter the petitioner began to receive phone calls from multiple unrecognized numbers while the police were still banging on his apartment door on his mobile phone, the Petitioner also received a text message from the apartment building superintendent.

Frightened, and panicked, the petitioner slowly tip-toed down the hallway leading to the front door of his apartment making sure that his phone was on silent  so as not to alert the officers outside his door to his presence in the apartment the Plaintiff would then notice that his phone was already on silent.

The Petitioner could hear the sound of police radios, and ringing doorbells both his own, and the door bells of other apartments on his floor being rung with a hard pressure and urgency that further alarmed the petitioner.

The Petitioner also noticed his door knob turning as if someone was trying to open the door from the other side, his heart racing and high blood pressure rising the petitioner began to feel light headed and dizzy as he held his trembling hands against the hallway walls as he leaned on the same for support as he meticulously tip-toed again to the door to reassess the situation through the people while simultaneous taking great care not to make any noise or in any vein cause the floorboards to make any sound owing to the pressure from his footsteps as he approached the inside side of his apartment door to quietly look through the people once again, upon this second approach to the peephole the petitioner noticed 5 individuals now gathered in the hallway surrounding the entrance to the apartment, one of these individuals was a neighbor who was bent over towards the Petitioner's door and had her ear pressed up against the Petitioner's door, as she jiggled the Petitioner's apartment door doorknob from the outside side of the door.

Another person who is also  a neighbor and resides in an apartment on the same floor next to the petitioner seemed to have been exiting his apartment while all of this was still going on and was asked by the Police if he had seen the petitioner, still another neighbor a female was also apparently questioned by the police and she and another gave them the petitioner's correct name,

again it must be noted that the petitioner directly observed this from the other side of the peephole.

Further, another individual the building's superintendent, was also present during these events, he too engaged in conversations with the officers regarding the petitioner's whereabouts and evidently the police officer had asked the superintendent to see the cameras as one of the officers made mention of the cameras and asked the superintendent if he had access to which the superintendent evidently responded in the affirmative and presumably began to show the officers camera footage of the surrounding area around the petitioner's apartment on his cell phone.

Utterly racked with panic, nervousness and fear the petitioner began to experience heart palpitations, nausea, and feelings of impending doom and oncoming syncope, fearing that he might faint realizing it was unwise for him to continue standing at the door, he again pressed himself up against the wall amidst a barrage of phone calls from unrecognized numbers, and continued loud reverberating knocks emanating from the other side of the door and a shout from one of the officers yelling "Hey James, open up its NYPD we just want to talk" it should be noted that even after receiving the correct name from the Petitioner's neighbor the officers still botched it.

As the knocks continued, the Plaintiff's mind racing darting back and forth about any reasons the Plaintiff may have been sought for arrest or questioning by the NYPD and fearing that based on the length of time of their presence, inquiries the police were making to his neighbors and the incessant knocking and amplified authoritatively toned commands to "Open up" the Petitioner began to fear that the door would be knocked down any minute and that he would be arrested and taken to jail.

The Plaintiff has a host of ailments including Post Traumatic Stress Disorder, (PTSD) End Stage Renal Disease (ESRD), Congestive Heart Failure (CHF), Hypertrophic Cardiomyopathy (HCM) Obstructive Sleep Apnea (OSA), Anxiety, and Chronic Severe Hypertension.

At all relevant times Defendants Lenox Hill, Schwimmer, and Island had knowledge of the same.

The Petitioner returned to his bedroom and took his blood pressure which was 212/109 the petitioner feared he could either have a stroke, lose consciousness, and maybe even go into cardiac arrest.

For a period of about 2-3 hours the officers remained present on the premises.

The Plaintiff, believing the Police may have been there to arrest him over a dispute with a former acquaintance and later fled the premises after he could no longer discern a police presence in the building.

The Plaintiff ordered a taxicab and fled fearing that after having already missed 3 dialysis sessions that if he were arraigned he might not be able to get to his regularly scheduled dialysis and might be at risk of death if he were detained too long before he could get to dialysis.

Fearing that the Police might return and arrest him the Plaintiff arranged for accommodations which cost him close to $2,000 USD inclusive of restaurant meals and new clothes and felt that this freedom might be in jeopardy if he returned to his home.

Ironically, the Police were called to the premises of the  lobby of Plaintiff's temporary accommodations on the night of June 30th, 2022, the Plaintiff attempting to calm himself down thought he would go for a walk upon seeing the officers the Plaintiff once again begin to experience nausea, headaches and dizziness, seeing the officers but unable to be certain why they were there and recognizing that it was possible that the officers could be on the premises for an

entirely unrelated reason to him (which the next night he would find out from staff at the place of accommodation the officers were in fact on the premises for an issue entirely unrelated to him that involved a couple unknown to the Plaintiff who were also guests), but unable to be certain the Plaintiff turn around got back on the elevator and went back to his room.

The Plaintiff from his room could hear the whirr of the ascending elevator and the sound of the bell of the elevator as it rose to its destination floor, even the sound of the opening elevator doors opening as they retracted along their mechanized cogs and pulleys to usher its riders out to their destination floor seemed to be intensified to him owing to his under the circumstances understandably panicked belief that the NYPD was pursuing him, the staff of the place of accommodation although just carrying out their normal duties, would traverse the floors with their handheld radios, the blurred sound of the frequencies of devices that are basically "Walkie-Talkies" evoked in the Plaintiff a sense of dread and fear sometimes believing that those sounds could be coming from an officer in pursuit him.

In fact, the Plaintiff even called a criminal defense attorney for advice and counsel, the Plaintiff was so distraught and had recurring nightmares over the incident.

The Attorney provided counsel and the Plaintiff decided that 1.) It was too expensive to remain away from his home much longer. 2.) That the attorney had given him advice on how best to

protect himself from legal jeopardy and promised to be there for the Plaintiff should the Police come to his home again.

Over 2 weeks later the Plaintiff  had finally returned home and would learn by happenstance from the building superintendent that a doctor had called the police to his home and apparently according to the superintendent had also called the building management.

Later that week, a concerned neighbor had revealed to the Plaintiff that the police officers had openly communicated to him and other neighbors that the Plaintiff was on dialysis disclosing the Plaintiff's previously undisclosed medical condition to his neighbors who had previously not known of his condition.

Later that week at dialysis, the Plaintiff shared with the staff some of the details of these events as over the course of about 6 months he had gotten to know and feel comfortable with most of the staff there and regularly conversed with them.

Upon revelation of the incidents complained of herein to the staff at the dialysis center, one of the staff informed the Plaintiff that one of the staff members at Island, had called the police to his home.

Utterly furious, the Plaintiff asked to be taken off the dialysis machine at once, waves of anger rushed over the Plaintiff at this revelation and the dialysis machine began to register stratospheric increases in his blood pressure rising into stroke level territory.

A deep sense of anger, violation, mistrust, betrayal, and suspicion began to overtake him which began to transform itself into barely containable rage.

Who at this place where he thought he was amongst friends would do such a thing he pondered? And Why? And Why surreptitiously?

Was he not already vulnerable enough? Who on the staff did not know the Plaintiff and had not conversed with him regularly over 6 months and frequently and for hours, he had thought that staff had perceived him as intelligent, articulate and engaging so why on God's green earth would someone call the police to his home?

The Plaintiff would later learn from the renal social worker, when he returned to Island for further dialysis that the purpose of the call was a "wellness check."

But this proposition, even if it can be taken as true or is true, troubled the Plaintiff even more because he had just talked to the renal social worker the day before the Police arrived  at his home for several minutes over the phone.

During that conversation the renal social worker relayed her concern that the Plaintiff had missed 3 dialysis sessions at which point the Plaintiff thanked her for her concern and relayed to her that he had been quite busy and that it was difficult as a single man to take care of his day to  day affairs and have a perfect dialysis attendance record at the same time ; so sometimes he felt he would have to take the risk a throughout and measured risk, he explained to her that he had would do his absolute best to get to Island soon for dialysis and in fact would do his best  to get there the very next day as he had a special medical test that requires repeated blood draws over a period of several hours that he had been trying unsuccessfully to have administered for very well over a decade and was scheduled to be administered at Island's facility to reduce the burden of the test by a non-defendant physician at that very dialysis center that Friday as the necessary blood  draws for that could be done straight from the dialysis lines without having to repeatedly puncture the Plaintiff's skin and he even promised her (the renal social worker)  that if he started to feel unwell he would go to the emergency room immediately.

Defendant Schwimmer knew he was scheduled for this test because he coordinated  with Island to have it done there.

Historically, Island has always been able to get in touch with the Plaintiff, the Plaintiff has missed dialysis sessions before the relevant time frames indicated in this complaint and the police had not been called.

So with these facts in mind what was there to call the Police to his home? The renal social worker less than 24 hours prior confirmed that Plaintiff was alive and lucid and that he had had a plan should his condition worsen.

Moreover, Island had been aware that the Plaintiff not infrequently visits  the emergency room associated with their dialysis center and has an affiliate partnership with said emergency room.

The Plaintiff has working fingers and an active mobile phone and enough common sense to visit an emergency room should he feel he has reason to believe his health is imminent danger owing

to symptoms and knows how to dial 911 and everyone the Plaintiff has ever encountered on Island knows this,  indeed on one occasion he even called 911 himself in the presence of Island staff to have an ambulance deliver him to the emergency room after an Island employed dialysis technician improperly inserted a 16 gauge needle into his left arm and caused his fistula to be infiltrated causing his right hand and arm to swell with a dangerous accumulation of pooled blood, his entire right arm to radiate with severe pain causing him to wretch and scream and writhe in agony.

The Plaintiff had previously  missed dialysis sessions before, the Plaintiff has received calls from Island in the past when he had missed 2 or more dialysis sessions and to the extent that the Plaintiff had missed Island's call he would habitually return their calls promptly.

The Plaintiff weeks later still disgruntled and traumatized regarding the whole police being called to his home situation, was informed by an Island staff member that the "doctor must have ordered the call, because we don't ever call the police to a patient's home unless the doctor orders us to."

The Plaintiff respectfully alleges that but for the doctor's precipitous decision to order Island staff to call the police to his home that  1.) The Plaintiff's personal health information that a.) his status as an ESRD patient would not have been disclosed to his neighbors. 2.) That he would not

have experienced a violation of his right to be free of unreasonable search and seizure owing to

the Police surrounding his apartment building and individual apartment door. 3.) That he would

not have experienced the psychological, emotional, and physical trauma owing to the same.

Although HIPAA, generally does not provide a private right of action for unauthorized

disclosure of Protected Health Information (PHI) the fact that HIPAA does protect health

information evinces a general public policy against the unauthorized disclosure of PHI.

Defendants Lenox Hill, Schwimmer, and or Island's disclosure of PHI to law enforcement is

state action because Federal law requires these defendants as HIPAA covered entities to make a

minimum necessary determination regarding the legality of the disclosure prior to so disclosing

to a law enforcement or governmental agency. *See* 45 CFR 164.502(b), and 45 CFR 164.514(d)

A HIPAA covered entity may lawfully disclose PHI to law enforcement or other government

agencies under the following circumstances:

To comply with a court order or court-ordered warrant, a subpoena or summons issued by a

judicial officer, or a grand jury subpoena. The rule recognizes that the legal process in obtaining

a court order and the secrecy of the grand jury process provides protections for the individual's private information (45 CFR 164.512(f)(1)(ii)(A)-(B)).

To respond to an administrative request, including an administrative subpoena or summons, a civil or an authorized investigative demand, or similar process authorized under law, provided that: the information sought is relevant and material to a legitimate law enforcement inquiry; the request is specific and limited in scope to the extent reasonably practicable in light of the purpose for which the information is sought, and de-identified information could not reasonably be used (45 CFR 164.512(f)(1)(ii)(C)).

To respond to a request for PHI for purposes of identifying or locating a suspect, fugitive, material witness or missing person; but the covered entity must limit disclosures of PHI to name and address, date and place of birth, social security number, ABO blood type and rh factor, type of injury, date and time of treatment, date and time of death, and a description of distinguishing physical characteristics. Other information related to the individual's DNA, dental records, body fluid or tissue typing, samples, or analysis cannot be disclosed under this provision, but may be disclosed in response to a court order, warrant, or written administrative request (45 CFR 164.512(f)(2)).

This same limited information may be reported to law enforcement when it is:

About a suspected perpetrator of a crime when the report is made by the victim who is a member of the covered entity's workforce (45 CFR 164.502(j)(2));

To identify or apprehend an individual who has admitted participation in a violent crime that the covered entity reasonably believes may have caused serious physical harm to a victim, provided that the admission was not made in the course of or based on the individual's request for therapy, counseling, or treatment related to the propensity to commit this type of violent act (45 CFR 164.512(j)(1)(ii)(A), (j)(2)-(3)).

To respond to a request for PHI about a victim of a crime, and the victim agrees. If, because of an emergency or the person's incapacity, the individual cannot agree, the covered entity may disclose the PHI if law enforcement officials represent that the PHI is not intended to be used against the victim, is needed to determine whether another person broke the law, the investigation would be materially and adversely affected by waiting until the victim could agree, and the covered entity believes in its professional judgment that doing so is in the best interests of the individual whose information is requested (45 CFR 164.512(f)(3)).

Where child abuse victims or adult victims of abuse, neglect or domestic violence are concerned, other provisions of the Rule apply:

Child abuse or neglect may be reported to any law enforcement official authorized by law to receive such reports and the agreement of the individual is not required (45 CFR 164.512(b)(1)(ii)).

Adult abuse, neglect, or domestic violence may be reported to a law enforcement official authorized by law to receive such reports (45 CFR 164.512(c)):If the individual agrees; If the report is required by law; or if expressly authorized by law, and based on the exercise of professional judgment, the report is necessary to prevent serious harm to the individual or others, or in certain other emergency situations (see 45 CFR 164.512(c)(1)(iii)(B)).

Notice to the individual of the report may be required (see 45 CFR 164.512(c)(2)).

No such revelation or notice as required by the above was made by either Island nor Schwimmer nor Lenox  until weeks after the Police had come and gone and only on a chance disclosure by the then as yet unaware plaintiff to Island staff .

A covered entity may report PHI to law enforcement when required by law to do so (45 CFR 164.512(f)(1)(i)). For example, state laws commonly require health care providers to report incidents of gunshot or stab wounds, or other violent injuries; and the Rule permits disclosures of PHI as necessary to comply with these laws.

A covered entity may also disclose PHI to alert law enforcement to the death of the individual, when there is a suspicion that death resulted from criminal conduct (45 CFR 164.512(f)(4)).

To share with medical examiners or coroners to assist them in identifying the decedent, determining the cause of death, or to carry out their other authorized duties(45 CFR 164.512(g)(1)).

To report PHI that the covered entity in good faith believes to be evidence of a crime that occurred on the covered entity's premises (45 CFR 164.512(f)(5)).

When responding to an off-site medical emergency, as necessary to alert law enforcement about criminal activity, specifically, the commission and nature of the crime, the location of the crime or any victims, and the identity, description, and location of the perpetrator of the crime (45 CFR 164.512(f)(6)). This provision does not apply if the covered health care provider believes that the individual in need of the emergency medical care is the victim of abuse, neglect, or domestic violence; see above Adult abuse, neglect, or domestic violence for when reports to law enforcement are allowed under 45 CFR 164.512(c).

When consistent with applicable law and ethical standards a covered entity may disclose PHI, to a law enforcement official reasonably able to prevent or lessen a serious and imminent threat to the health or safety of an individual or the public (45 CFR 164.512(j)(1)(i)); or to identify or apprehend an individual who appears to have escaped from lawful custody (45 CFR 164.512(j)(1)(ii)(B)).

To the extent that Schwimmer or Island made their disclosure to the NYPD pursuant to 45 CFR 164.512(j)(1)(i)); Schwimmer, Island, or Lenox Hill were required by federal law to inform him that such a disclosure would be made *See* 45 CFR 164.512(c)(2)

The Plaintiff repeats that no such revelation was made by either Island nor Schwimmer nor Lenox until weeks after the Police had come and gone.

A law enforcement official would not have been "*reasonably able*" to prevent or lessen any harm or imminent threat to the patient's health accruing from a chronic kidney disease as such harm would have necessarily been entirely attributable to declining function of an internal organ, that is to say the police could not have administered dialysis, or controlled the Plaintiff's diet or administered any other type of medical therapy that extract accumulated toxins from his bloodstream  as this is the only type of therapy short of a kidney transplant  that can address the primary deleterious effects of renal failure nor was the Plaintiff in need of life saving techniques or applications like CPR or defibrillation.

The best the Police would have been able to do in these circumstances would have been to have attempted to, or  persuade, or maybe even coerce the Plaintiff to go to the emergency room and either call an ambulance or deliver him there themselves, but this they could only lawfully accomplish with the Plaintiff's assent, something that Schwimmer had already attempted to capture  unsuccessfully.

Having failed to convince the Plaintiff to go to the emergency room, either or both Schwimmer and Island resorted to contacting the Police for the undeniable purpose of coercing the Plaintiff

by invocation of the inherent authority in a badge and police powers of the police to intimidate the Plaintiff into involuntarily going to the emergency room.

This sort of situation bears striking similarities to an attempt to have someone committed involuntarily to a medical facility precisely because it is clear from the facts that will be shown that the Plaintiff did not want to go.

The Plaintiff alleges that this particular call to the police in these particularized alleged circumstances for a so-called 'wellness check" was or was an attempt by Schwimmer, Island or Lenox Hill or all of the above to act pursuant to or by proximity to— to exercise or avail themselves of a coercive power a power traditional reserved to the state.

To the extent that Schwimmer or Island made their disclosure to the NYPD pursuant to 45 CFR 164.512(j)(1)(i)) no such situation covered therein existed and therefore such an invocation of the police or disclosure of his PHI was unwarranted and unjustifiable and unlawful.

"For the purposes of section 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by

the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test")..." *Sybalski v. Independent Grp.*, 546 F.3d 255 (2d Cir. 2008).

Courts in this circuit have found state action where as here is private action is "so governed by state regulation as to be properly attributed to the state." *Oakley v. Fed'n Emp't & Guidance Servs. Inc*., 10 Civ. 7739 (JSR), at *9 (S.D.N.Y. Jan. 3, 2012)

Island, Schwimmer  and or Lenox Hill Defendants are state actors under 1.) The Coercive Action Test, 2.) Joint Action and or Close Nexus Test and 3.). The Public Function Test.

Island, Schwimmer, and or Lenox Hill are state actors because in calling the police to Plaintiff's home; Island, Schwimmer and or Lenox Hill were motivated by a policing animus, that is to say that the policing function is generally a function exclusively reserved to the state. That is to say, that because the Medical Defendants had not only other means to confirm the Patient's wellness, but indeed had already done so the previous day, and because the Police could not have administered any sort of medical examination, nor administer any medical therapy had the

patient been suffering from any more troubling than usual symptoms, the best the Police would have been able to do for the Medical defendants had they not performed such a check so recklessly would be to do that which the Plaintiff had already done for Island the day before and the same should have been plainly clear to the Medical Defendants, and this supports an inference of an attempt to employ a coercive power, and typically all powers of coercion are reserved to the state.

The fact that the Medical Defendants withheld this information taken together with the fact that the police would not have been able to administer any medical treatment or take any concrete particularized action to alleviate any baleful effects of ESRD that could ameliorate or lessen the same supports an inference of an attempt at coercion because the Plaintiff had no other reason to listen to the police but for fear of their apparent inherent coercive powers because 1.) Police are not medical experts and are therefore not qualified to render medical opinions or generally to render medical treatment. 2.) The Police are agents of the state, and could reasonably be misconstrued by an unaware patient that their presence constituted an order of the state to go to the emergency room.

The Plaintiff respectfully realleges that over and above the fact that Island had confirmed the Patients lucidity the day before there were still less intrusive means to confirm the Plaintiff's status again, that he was alive, and not in any acute distress. For example, the doctor in question

has the Plaintiff's cell phone number and email address and frequently texts, calls, emails the
Plaintiff to which the Plaintiff usually responds.

The Patient had of his own volition  scheduled an appointment with that doctor several days
before the police came  to  his  home and to whit, for the very same day that the police came to
his  home.

The Plaintiff repeats his allegation that the Island is an affiliate of the hospital  where the
Plaintiff frequently receives emergency treatment and hereby adds to that allegation that 1.) The
doctor in question is also employed by and affiliated with that  hospital's emergency room that
doctor has unfettered access to his emergency room treatment records, and that 2.) because he
receives treatment at that particular emergency room and this doctor and Island has before and at
other relevant times received direct updates on the Plaintiffs treatment while in the emergency
room.

The Plaintiff alleges that the doctor was beyond concerned but rather frustrated or irritated  that
the Plaintiff had missed dialysis sessions and that relief from mere frustration and irritation is an
improper motive for calling the police on someone.

The Plaintiff alleges that Island would not have been able to bill his insurance for treatments on days when the Plaintiff did not come to dialysis.

The Plaintiff alleges that in the days leading up to his treatment the doctor did text and email and "ordered" him to the emergency room.

The Plaintiff alleges that the call to the Police was an attempt by one or more of the Medical Defendants to establish dominance over the Plaintiff even if the Medical Defendants felt it was for his own good.

The Medical Plaintiff's decision to call the Police despite the Plaintiff affirming his lucidity as an adult male and his flat refusal to go to the emergency room unless *he* felt he needed to go and the call to the police anyway with a coercive motive constitutes an attempt by the Medical Defendants to assume Parens Patriae status (a status and or power reserved to the state) and the functions attendant thereto.

"Parens patriae is defined as either the state in its capacity as provider of protection to those unable to care for themselves; or, a doctrine by which a government has standing to prosecute a lawsuit on behalf of a citizen. Black's Law Dictionary (9th ed. 2009). The Court recognizes that the state has a legitimate interest under its parens patriae powers in providing care to its citizens who are unable ... to care for themselves, as well as "authority under its police power to protect the community" from any dangerous mentally disabled persons. Addington v. Texas,441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979); see also Heller v. Doe by Doe,509 U.S. 312, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). States are vested with the historic parens patriae power, including the duty to protect "persons under legal disabilities to act for themselves." Hawaii v. Standard Oil Co.,405 U.S. 251, 257, 92 S.Ct. 885, 888, 31 L.Ed.2d 184 (1972); see O'Connor v. Donaldson,422 U.S. 563, 583, 95 S.Ct. 2486, 2497, 45 L.Ed.2d 396 (1975) ("The classic example of this role is when a State undertakes to act as 'the general guardian of all infants, idiots, and lunatics.' "); Matter of Sayeh R.,91 N.Y.2d 306, 313, 670 N.Y.S.2d 377, 693 N.E.2d 724, 727 (1997) ("[i]n its role as parens patriae, New York is under a powerful duty to protect its domiciliaries from harm); Matter of Maimonides Med. Ctr.,173 Misc.2d 111, 117–18, 660 N.Y.S.2d 614 (Sup.Ct.Kings Co.1997) ("The State's parens patriae power vests the State with the duty to protect persons unable to care for themselves but it may not be exercised indiscriminately nor invoked to confine a non-dangerous individual solely for the purpose of providing treatment."); see also N.Y. Const., art. XVII, § 3 ("The protection and promotion of the health of the inhabitants of the state are matters of public concern and provision therefor shall be made by the state and by such of its subdivisions and in such manner, and by such means as the legislature shall from time to time determine."). See *Judge Rotenberg Educ. Ctr. Inc. v. Blass*, 882 F. Supp. 2d 371, 387 (E.D.N.Y. 2012).

"...[B]ut it may not be exercised indiscriminately nor invoked to confine a non-dangerous individual solely for the purpose of providing treatment." *Id*.

And on the facts if not in intent then certainly in effect, exactly what happened in the instant case as the Medical Defendant(s) sought to invoke or perhaps even usurp a function or cause the state (NYPD) to take an action that in the absence of the Medical Defendant(s) actions would not have normally taken.

The Plaintiff repeats that at that time, he did not want, nor did he feel or believe he needed to go to the emergency room, because in the days leading up to the Police's arrival at his doorstep he had managed to keep his blood pressure relatively in check through a combination of various blood pressure medicines that had been prescribed to him mainly by his cardiologist, he was still urinating, and did not experience any disorientation, or any other symptoms that were outside of the usual, the fatigue was no worse and slight depression was no worsse either, the Plaintiff did not at the time Schwimmer attempted to pressure the Plaintiff to go to the emergency room, feel light headed, or dizzy without exertion primarily because in seclusion any immediate or acute stressors were largely curtailed resulting from the needs or demands of otherss had been sharply curtailed.

Schwimmer apparently believed the Plaintiff was unable to care for himself. Indeed, the Plaintiff is not a child, nor an idiot, nor a lunatic, given the fact that Plaintiff had on some occasions refused explicitly or implicitly by either directly stating he would not go to the emergency room or by simply not reporting to the emergency room in times past and repudiated Schwimmer's urging and or commands to go to the emergency room it can be inferred that Schwimmer perceived the Plaintiff as one who was in need of Patriens Pariae intervention despite evidence to the contrary. Indeed to the contrary, the Plaintiff is a rationally thinking autonomous adult. And Schwimmer's action constitutes and infringement on that autonomy.

The Plaintiff alleges that despite Defendants apparent belief to the contrary, none of the aforementioned circumstances under which disclosure of PHI is authorized were present in the instant case.

In addition to the privacy rights that are direct creatures of constitutional jurisprudence and guaranteed to the Plaintiff thereunder, although  HIPAA does not provide a private right of action it does  provides a limited or qualified right of privacy and is also in addition to any constitutional privacy claims,  a fair basis for invoking a 42 USC 1985(3) or 42 USC1983 claim for infringement on or deprivation of rights, respectively.

The Plaintiff alleges that the doctor's choice  to call the police was motivated by a desire to control the Plaintiff and bases this allegation on the doctor's constant ordering him to the emergency room despite having no medical evidence to support a worsening in the Plaintiff's condition, i.e. to say that there was no medical evidence that factored into the doctor's decision to have the police called on his own patient other than speculation if one can even  justifiably call such speculation medical evidence.

Had any of the medical defendants informed the NYPD of the same such a wellness check, the NYPD could have had sufficient information to conclude that conducting a wellness check was either unwarranted or unnecessary.

"Wellness Checks" can be used to surreptitiously cause annoyance and disruption and this court should take this truth into consideration and not give a wholesale deference to a presumed well meaning intent.

If Schwimmer or Island was that alarmed either of them could have come themselves or sent a representative instead of either maliciously or haphazardly, or  maliciously, or mechanistically, and thoughtlessly invoking the Police power of the state causing the NYPD to the Plaintiff's home to see about his welfare; either of them could have arranged for a nurse, asocial worker to visit his home.

Indeed, it is neither unusual nor uncommon nor unheard of for non-state officials such as Nurses, Social Workers, or even doctors to visit patients/clients at home. In fact, Schwimmer regularly communicated with nurses from either the Visiting Nurse Service or Lenox Hill Hospital.

In the age of "Karens" and "Black  Lives Matter" and the Patient obviously being a black male and the doctor presumably having the knowledge that the invocation of the police force is far too often a reflection of certain citizens weaponizing the police against people of color in American Society; ergo it boggles the mind that considering the availability and viability of the less intrusive options to call or text or visit the patient, and given several previous lengthy and friendly conversations  with the doctor in question would not have realized it was safe to talk to the Plaintiff and  how badly even a well meaning (though the Patient does not believe this call to the Police was about his wellness at all) "wellness check" could "go south" as the colloquialism goes, in the absence of advance notification to the Plaintiff regarding the same and under the circumstances is at best remarkably careless and insensitive, and at worse, untoward.

The doctor regularly sees the Plaintiff at Dialysis. There are myriad ways the doctor could have checked on the Plaintiff's welfare without calling the police on him.

The doctor could have picked up the phone and called the Plaintiff or texted him or emailed him as he usually does and at the very least expressed his plans to call the Police should he not go to the emergency room but for some inexplicable or unknown reason the doctor deliberately withheld this information regarding his intention to call the police.

The Plaintiff alleges that one or more of the Medical Defendants wanted the Plaintiff to live in fear that if he didn't show up to dialysis the Police would be repeatedly called to harass and annoy him into going, if the Medical Defendants called the Police once under these circumstances why would they not do it again should said circumstances recur? What is there to prevent them from doing so should it recur?

Should such a strategy be successful in increasing compliance with medical treatment protocols, such as more perfect attendance at dialysis such a strategy would act as a profit protecting or increasing mechanism and could serve as a temptation for any Medical defendant to use the police as a means to this end;  this is an impermissible motive for invoking the police in the context of medical care.

In addition to the reasons listed above, the Medical Defendants are state actors under the Close or Nexus test  because as demonstrated by several citations to the relevant chapter of the Code of Federal Regulations, the Defendants activities are "so governed by state regulation as to be properly attributed to the state" *Oakley,* supra.

Numerous Federal and State regulations govern defendant Island, as both a Medicare Certified provider of ESRD treatment, namely dialysis. For example as already shown above, Title 45 of the CFR is replete with rules, regulations, and specifically enumerated permissions that both inform and represent the contours within which Island and Lenox Hill (who employs Schwimmer) must operate as are several other federal provisions of law including Title 42 of the CFR and New York Codes, Regulations & Rules.

For example, 10 NYCRR 757.2(g) provides that: Each chronic renal dialysis center **shall collaborate** with its ESRD network*,* suppliers, utility service providers and the department for surveys and for emergency preparedness, and **shall also collaborate w**ith other chronic renal dialysis centers to ensure that lifesaving dialysis services are available in the event of an emergency or disaster. The chronic renal dialysis center **shall develop written policies and procedures that detail the actions it shall take and plan to be implemented in the event of an emergency or disaster. (emphases mine).**

To the extent that Island, or Lenox Hill maintains a policy requiring that the police be called if a patient misses a few dialysis  sessions and the same considers such an "emergency" for the purposes of  10 NYCRR 757.2(g) such a factual scenario satisfies the Close Nexus test.

More, at the Federal Level, the Centers for Medicare, and Medicaid Services (CMS) encourages entities such as the Medical Defendants to "[ask] the police to help locate a patient so that he/she can receive dialysis."

Notwithstanding, the Plaintiff was not during any relevant period a "missing person," and indeed the Medical Defendants had his current address and current telephone number and at no time was

he in any need of being "located," heck they sent the police right to me they certainly didn't have to search for me to figure out where I might be.

Further, Title 42 of the CFR § 405.2102, defines an ESRD Network as basically one or more Medicare Certified dialysis centers like Island, within a designated geographic area specified by CMS.

New York law defines an ESRD Network thusly: "End-stage renal disease (ESRD) network means entities **contracted with t**he Federal government that collect and share data and other information with the Centers for Medicare and Medicaid Services (CMS), New York State and chronic renal dialysis centers within a specific geographic area." *See* 10 NYCRR 757.2(a)(2) emphasis mine.

Further still, Title 42 of the CFR § 405.2102 defines network organization as: The administrative governing body to the network and **liaison to** the Federal government.

Throughout these rules & statutes the terms *collaborate, network,* and *liaison,* indicate entwinement with the state. For example, The Merriam-Webster Online Dictionary lists the

following synonyms for liaison: affinity, association, bearing, connection, kinship, linkage, relation, relationship, the same dictionary defines liaison as: a close bond or connection.

Indeed, even the etymology of the term liaison points to the  kind of  entwinement that the Second Circuit was concerned with in *Sybalski,* liaison: "a union, a binding together" (13c.), from Late Latin ligationem (nominative ligatio) "a binding,"

According to the Restatement of Torts:

(1.)One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other.

(2) The right of privacy is invaded by:

(a) unreasonable intrusion upon the seclusion of another, as stated in 652B; or

(b) appropriation of the other's name or likeness, as stated in 652C; or

(c) unreasonable publicity given to the other's private life, as stated in 652D; or

(d) publicity that unreasonably places the other in a false light before the public,

as stated in 652E.

Intrusion upon Seclusion

One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy if the intrusion would be highly offensive to a reasonable person. *See* Restatement (Second) of Torts §§ 652A-E (1997).

 Indeed, New York law does not recognize a common-law claim for invasion of privacy but the Constitution does.

To return to some of these prolix rules & regulations at the federal level 45 CFR further holds that:  A covered entity may also disclose PHI for certain other specialized governmental law enforcement purposes, such as:

To federal officials authorized to conduct intelligence, counter-intelligence, and other national security activities under the National Security Act (45 CFR 164.512(k)(2)) or to provide protective services to the President and others and conduct related investigations (45 CFR 164.512(k)(3));

To respond to a request for PHI by a correctional institution or a law enforcement official having lawful custody of an inmate or others if they represent such PHI is needed to provide health care to the individual; for the health and safety of the individual, other inmates, officers or employees of or others at a correctional institution or responsible for the transporting or transferring inmates; or for the administration and maintenance of the safety, security, and good order of the

correctional facility, including law enforcement on the premises of the facility (45 CFR 164.512(k)(5)).

Except when required by law, the disclosures to law enforcement summarized above are subject to a **minimum necessary determination** by the covered entity (45 CFR 164.502(b), 164.514(d)). Was this necessary?

When reasonable to do so, the covered entity may rely upon the representations of the law enforcement official (as a public officer) as to what information is the minimum necessary for their lawful purpose (45 CFR 164.514(d)(3)(iii)(A)), but ***only*** when reasonable to do so.

The Plaintiff alleges that law enforcement did not contact Schwimmer, Lenox Hill, nor Island for the purposes of initiating a "wellness check."

The Plaintiff alleges that Federal and State law governs and is so intricately entwined with the policies and actions of the Medical Defendants as described in this complaint that the Medical Defendants are state actors.

Although Schwimmer, Lenox Hill, or Island has characterized their call to the Police as for the purpose of a "wellness" check, they did not inform the NYPD that they or their representatives had successfully made contact with the Plaintiff, nor did they inform the NYPD that the Plaintiff had communicated a plan to Island staff renal social worker that he would go to the emergency room if he started to experience any concerning symptoms, nor did they inform the NYPD that the Plaintiff had promised that they had contacted that Plaintiff and that he would do his best to get to dialysis for his regularly scheduled session that Friday.

And therefore, it was not only unreasonable to call the police but also unreasonable for the Medical Defendant(s) to release the Plaintiff's PHI to the police.

The Medical Defendants deliberately or negligently withheld this information from the NYPD.

The Plaintiff alleges that in fact, the doctor had texted him while the Police were outside of his apartment door banging on it, commanding him to "open up" and still made no mention to him that he had ordered that the police be called on the Plaintiff by his staff or Island's staff as the

case may be and again on the very same day the Plaintiff had an in-person appointment to consult with him.

The Plaintiff alleges that the doctor's decision to call the police felt to him to be more about the doctor's need for control than the Plaintiff's welfare as again, there were less obtrusive means for confirming the status of his physical welfare.

Plaintiff alleges that the City of New York or more specifically, the NYPD was operating at the request of either Schwimmer or Island or both to carry out a specific task i.e., conduct a "wellness check" that would not have not been carried out had neither Schwimmer nor Island requested the NYPD to do so.

The Plaintiff alleges that due to the fact that the NYPD attempted to perform a "wellness check" that this request created an agency relationship between the other defendants and the NYPD.

Even if the Doctor was concerned about the Plaintiff's welfare the fact is that he cannot legally force him to go to the emergency room and neither could the police.

Even if the Doctor wanted or felt as a precautionary measure that the Plaintiff should go to the emergency room, the police still would not have been able to legally force him to go as this too would have constituted his Fourth Amendment right to be free from unreasonable search and seizure.

At the heart of the issue from Plaintiff's perspective, given these particularized circumstances is an unasked for and unwelcome power struggle, and these protocols whether they are creatures of statute directly, or once removed in this case, serve as a pretext to violate the Plaintiff's constitutional rights under both the New York and United States Constitution,   abused and used to intimidate or perhaps to supplant and usurp the will of the adult patient and substitute it with the doctor's; and under the circumstances present here, is unwelcomingly paternalistic at best, and at worse, categorically immoral and the court should not indiscriminately permit these defendants to rely on those protocols to insulate the Medical Defendants from liability.

Indeed, so called "wellness' checks just because they are so entitled or referred to as such does not mean the request for one cannot be motivated by or serve as a pretext for or be tainted by an improper motive or intent.

"The right to make decisions regarding one's own bodily integrity and medical treatment is embraced in both federal and state constitutional rights of privacy" Am.Jur. 2d Constitutional Law §650 (2020).

"[T]he Fourth and Fifth Amendments were described in *Boyd v. United States*, 116 U.S. 616, 630, as protection against all governmental invasions "of the sanctity of a man's home and the privacies of life." We recently referred in *Mapp v. Ohio*, 367 U.S. 643, 656, to the Fourth Amendment as creating a "right to privacy, no less important than any other right carefully and particularly reserved to the people." See Beaney, The Constitutional Right to Privacy, 1962 Sup.Ct. Rev. 212; Griswold, The Right to be Let Alone, 55 Nw. U. L. Rev. 216 (1960)"

*Griswold v. Connecticut,* 381 U.S. 479, 484-85 (1965).

See also: *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 278, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (holding that a "person has a **constitutionally** protected liberty interest in refusing unwanted medical treatment")

Police "wellness checks" are a function of the state power in its Parens Patriae capacity.

Plaintiff alleges that for the NYPD's part in the matter, at no time did they ever relay to the Plaintiff that the purpose of their visit to his home was a "Wellness Check" and thus performed the check negligently.

In fact, the officers that visited called the Plaintiff via cellular telephone after questioning his neighbors regarding his whereabouts and receiving his cell phone number from them, the Plaintiff knows this because he saw and heard this take place through the peephole of his apartment door and heard the police solicit his contact information and within seconds of observing one officer dial numbers on his cellphone the Plaintiff's cell phone began to silently "ring"featuring multiple phone numbers previously unknown to him.

Within a few minutes that same number called him again at least twice.

A few minutes later another number unbeknownst to him called twice.

Within a few minutes the superintendent called him which he normally does not unless he is returning the Plaintiff's call.

Within a few minutes of the superintendent's call the superintendent texted the Plaintiff asking "hi how are you?" to which the Plaintiff did not respond fearing that the superintendent was attempting to aid the police in apprehending him.

Despite having and attempting to contact the Plaintiff via his cell phone number no one had the common sense to text or otherwise indicate to the Plaintiff that they were attempting to perform a wellness check despite the fact that doing so would represent no inconvenience, the most infinitesimal expenditure of energy infinitely less than having a cadre of police officers corner him in his apartment and repeated banging on his door.

The doctor in his overzealousness  inflamed the passions of the police officers with doomsday suggestions either directly or through an intermediary, whom in turned perhaps unwittingly, terrified the Plaintiff and given his vulnerable physiological and psychological state owing to chronic conditions and childhood trauma of which the doctor and Island had a posteriori knowledge of, could have caused him to experience stroke heart attack, cardiac arrest and even syncope which could have led to physical injury had he fainted under the pressure, fear, stress, and panic.

People ought not to call the Police on each other in the absence of genuine emergency, observed criminal conduct or immediate or pending threat of harm, genuine fear of harm or actual harm.

None of these were present in the circumstances or facts surrounding this complaint nor was there sufficient basis to believe they were.

Despite this so often being the case for many people who are the subjects of a police call, people still far too often do so in the absence of these (harm, genuine belief of a threat of harm or complete lack of observed criminal conduct) with sometimes disastrous and harmful results for the person(s) that are those closely connected to the subject and sometimes even the police themselves.

No person wants to see intimidatingly statured armed men approaching their home unless they can be certain that the purpose or function of the visit is to help, serve, and protect and not inflict harm, without advanced or contemporaneous notice there was no way the Plaintiff could have discerned the purpose of their visit.

The Police had a duty to at least attempt to inform the Plaintiff of the purpose of their visit and they negligently did not do so.

Schwimmer knew the Police would be coming to the Plaintiff's home and despite Schwimmer texting and or calling the Plaintiff the very same day that Police came and indeed even while the police were on the Plaintiff's doorstep, Schwimmer never mentions or communicates that he has dispatched the Police to the Plaintiff's home.

To drive the earlier points home regarding privacy rights and the public policy issue of mandating that when pursuing suspected criminals pursuant to a warrant police if the warrant is not a no-knock warrant; that the police must announce their presence and the purpose of their engagement. Our constitution and rules extend this courtesy to even suspected or alleged criminals. How much more should the innocent and particularly the innocent and infirm receive the same?

Policing is not a laissez-faire business but rather one that's fraught with potential dangers for police and citizens alike and therefore the job is replete with obligations and responsibilities

voluntarily undertaken by officers and ergo they have the highest duty to conduct themselves with discipline, awareness, and may not thoughtlessly dispense with these as they did here.

The police cannot legally dispense with protocols governing their engagement with the subject of their action solely because they are operating under the nominal function of a "so-called wellness check."

Indeed, negligently, or otherwise inducing a state of fear does not promote nor aligns with the idea of "wellness," indeed very often fright produces the exact opposite

People as a general rule, ought to exercise care in invoking the robust powers of the police to accomplish their objectives and should endeavor to avoid wasting the time, energy, and resources of the same, nor should the availability of an offer to conduct wellness checks constitute a license to invoke the police or the appellation "wellness" check for the purposes of intimidation or coercion.

The Plaintiff's blood pressure historically at least over the past year alone has on average has measured in the hypertensive crisis range, the Plaintiff is experiencing heart failure, reduced

blood perfusion and compromised both left and right ventricles of his heart. It is not unreasonable to infer that under the totality of circumstances the NYPD even if its heart was in the right place as the saying goes, nonetheless through negligence exposed the Plaintiff to an unacceptable amount of stress that very well could have precipitated a host of potential adverse cardiovascular events, including but not limited to stroke, cardiac arrest, syncope, and even sudden cardiac death. The NYPD unless told in advanced cannot know of invisible preexisting conditions that might be aggravated by their style and method of approach; indeed aggression very rarely promotes wellness and induces stress and for individuals who are not under the suspicion of any particular criminal act, inducing stress is an unacceptable method for producing an outcome in this case either opening the door to talk to the police, or getting a patient to go to an emergency room  and for this reason the importance of announcing the purpose of their engagement is a ripe issue for this Court's examination.

The Plaintiff experienced extreme emotional and physical distress, and financial damages, the unauthorized and perhaps arguably plainly unlawful disclosure of his personal medical information both to law enforcement and his neighbors, and landlord, and understandable worries that his neighbors with police surrounding his door and banging on it, that he was a wanted criminal.

The Plaintiff further alleges that Lenox Hill, Joshua Schwimmer, and Island Rehabilitative Services are state actors for the purposes of all injuries to constitutional claims because they

could not operate without license from the state, that is the doctor would be in no position to order anyone to call the police on anyone based upon some conceptual medical authority without his license from the state, the Hospital which employs the doctor cannot operate without license from the state and  neither could Island and even if these entities are ultimately not found to be state actors they are otherwise still liable as private entities or on other grounds, moreover these defendants as providers of medical services to End Stage Kidney Patients are heavily regulated and I do mean heavily, regulated by HHS, CMS, NEW YORK STATE DEPARTMENT OF HEALTH, SOCIAL SECURITY and potentially others.

This overzealous and uncalled for action by the Medical Defendants and the NYPD could have caused the Plaintiff irreparable damage to his relationships with his neighbors, his reputation in the community, and severely jeopardized  his mental and emotional welfare; there was just simply no good reasons to call the police on the Plaintiff in light of the facts at issue and the law governing the same, and in so doing the Defendants caused the Plaintiff financial, physical, psychological and emotional distress with their ill-considered and categorically unnecessary jumping the gun.

The Plaintiff now commences this action for redress.

**<u>CAUSES OF ACTION</u>**

## AND AS FOR A FIRST CAUSE OF ACTION AGAINST THE NEW YORK CITY POLICE DEPARTMENT DEFENDANTS NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

The Plaintiff repeats and realleges all prior or preceding paragraphs as though alleged here.

Under New York law, the tort of negligent infliction of emotional distress has four elements: (1) breach of a duty owed to the plaintiff, which breach either unreasonably endangered the plaintiff's physical safety or caused the plaintiff to fear for his or her physical safety; (2) extreme and outrageous conduct; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Francis v. Kings Park Manor, Inc*., 14-CV-3555, 2015 WL 1189579, at *13 (E.D.N.Y. Mar. 16, 2015). *Smith v. City of N.Y*., 14-CV-4982 (E.D.N.Y. June 26, 2015)

The Plaintiff alleges that the NYPD had a duty to notify the Plaintiff that the purpose of the visit was to check on physical or mental wellness and at no time did the officer do so.

The Plaintiff alleges that because the NYPD did not attempt to notify him or sufficiently attempt to notify him that the purpose of their visit was his welfare their failure to do so caused their conduct to become outrageous.

The fact that Defendant NYPD did not do so placed the Plaintiff in fear of his physical safety.

The Plaintiff further alleges that because the NYPD officers did not do so, the Plaintiff experienced extreme emotional distress.

The Plaintiff also suffers from PTSD and as a result experienced heart palpitations, flashbacks, hallucinations, and nightmares.

## AND AS FOR A SECOND CAUSE OF ACTION AGAINST THE NEW YORK CITY POLICE DEPARTMENT GENERAL NEGLIGENCE

The Plaintiff repeats and realleges all preceding paragraphs as though alleged here.

The elements of a negligence claim brought under New York law are well settled. They are as follows: "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Lombard v. Booz-Allen & Hamilton, Inc.,* 280 F.3d 209, 215 (2d Cir. 2002); see, e.g., *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 177 (2d Cir. 2013); *Alfaro v. Wal-Mart Stores, Inc.,* 210 F.3d 111, 114 (2d Cir. 2000).

The NYPD had a duty to conduct wellness checks in a non-threatening manner.

The NYPD had a duty to advise that the purpose of their visit was a wellness check.

The NYPD had a duty not to disclose the Patient's health status to his neighbors without sufficient cause.

The NYPD breached all of those duties and thereby caused the Plaintiff damage.

## AND AS FOR A THIRD CAUSE OF ACTION AGAINST THE MEDICAL DEFENDANTS NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

The Plaintiff repeats and realleges all preceding paragraphs as though alleged here.

The elements of NEID were stated above but out of an abundance of caution are repeated as though alleged here.

Island Rehabilitative Services had a duty to choose the least obtrusive means to check on the Patients welfare.

Island had a duty to check for the last date and time the patient had been contacted by the staff before calling the police to the extent they had not done so they were negligent.

Calling the police on the Plaintiff before attempting to contact him by phone is an extreme step and especially having made contact with him both the day of and the day before the police's "intervention" ...

Island breached those duties and thereby caused the Plaintiff extreme emotional distress.

## AND AS FOR A FOURTH CAUSE OF ACTION AGAINST THE NEW YORK CITY POLICE DEPARTMENT VIOLATION OF THE PLAINTIFF'S CONSTITUTIONAL RIGHT TO BE FREE FROM UNREASONABLE SEARCH AND SEIZURE AS GUARANTEED BY THE FOURTH AMENDMENT.

The Plaintiff repeats and realleges all preceding paragraphs as though alleged here.

The NYPD is a subdivision of the state of New York and therefore is a state actor.

The fourth amendment of the United States Constitution guarantees the Plaintiff the right to be free from unreasonable search and seizure.

The NYPD's actions as alleged above and under the circumstances enumerated herein constitute an unreasonable search and/or seizure and a violation of the Plaintiff's Constitutional right to be from the same.

**AND AS FOR A FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS PURSUANT TO 42 USC 1985(3)**

The Plaintiff repeats and realleges as all preceding paragraphs as though alleged here.

The Plaintiffs alleges that there was a meeting of the minds between all defendants and that Medical Defendants Schwimmer and Island had a meeting of the minds to discuss the call to the Police before calling them and had advised of the Patient's ESRD status and instructed them to attempt to get the Police to get him to go to the emergency room despite the Medical Defendants awareness that he had already previously declined to go to the emergency room barring the emergence of new symptoms.

All defendants conspired for an illegal purpose to deprive the Plaintiff of his civil rights, specifically, the right to be free from unwanted medical treatment.

The Defendants took actions in furtherance of the illegal conspiracy such as the medical defendants calling the police for an illegal and unwarranted purpose. And as for the NYPD employing unlawful coercive means such as banging on his door for hours and surrounding his apartment door to get him to do so, again, in the midst of all this aggressive action they do not announce the intent of their visit despite knowing what the supposed putative intent of their visit was.

Defendant NYPD knew that the true purpose of the visit was to attempt to get the Plaintiff to go to the emergency room and or dialysis  and knew or should have known beforehand that he clearly did not want to do so and he previously declined to do so, otherwise what reason had the NYPD to visit his home or be called to do the same and that the Plaintiff had voluntarily elected to forego a few  dialysis treatments and did employ coercive means in an attempt to get him to attend dialysis more frequently and to intimidate him into going to the emergency room and thereby violated his right to be from unlawful search and seizure as guaranteed by the fourth amendment and thereby attempted to violate his right to be free from unwanted medical treatment and unnecessarily disclosing disclosing his PHI , particularly his ESRD status   and treatment to his neighbors and landlord violated his constitutional right to privacy as guaranteed by both the Fourth and other amendments.

As a general proposition, any persuasive power the NYPD may have possessed to get the Plaintiff to go to either dialysis or the emergency room necessarily arises from their status as agents of the state invested generally speaking with coercive power.

Again, the Plaintiff alleges that he has constitutional right to be free from unwanted medical treatment and there is a line between encouragement and coercion and the defendants in their

overzealousness transgressed that line, the line that is meant for our neighbor's protection more specifically protection of their rights.

The Plaintiff alleges a class based invidious discriminatory animus, because 1.) Undoubtedly End Stage Renal Disease Patients represent a class. 2.) The Plaintiff had made contact with both Schwimmer and the Renal Social Worker from Island on the day of and before and there was no mention to the Plaintiff by either to call the police on him, 3.) The past couple years the major media and news outlets have been replete with reports on the deaths and unfair apprehensions and other engagements with people of color by the police and the social unrest that often ensues. 4.) The assumption that the Plaintiff was too unsophisticated to decide for himself whether he would really benefit from going to the emergency room despite his previous record of going both on his own volition and at Schwimmer's request, despite several emails and text exchanges and in person conversations with Schwimmer regarding university level studies done on various comorbidities, etiologies, pathophysiology, of End Stage Renal Disease that this doctor would think the Plaintiff wouldn't recognize the signs of anything unusual pointing to a need to go to the emergency room.

Indeed, the Plaintiff knows how to dial 911, his fingers work, his mind is lucid, he takes his blood pressure medication and even measures it at home, previous checks by doctor's at the very same hospital less than 3-4 weeks prior to this "wellness check", showed no pleural effusions, his blood pressure wasn't any worse than usual, his blood had already been taken and tested a bunch of times by this same hospital in less than 60 days, his potassium and phosphorus readings where in normal limits, and although the Plaintiff's blood urea nitrogen (BUN) clearance ratio

was somewhat high it was no higher than usual and no sharp declines in the clearance of uremic toxins from the blood stream had been observed.

## AND AS FOR A SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
## DEPRIVATION OF CIVIL RIGHTS PURSUANT TO 42 USC 1983

The Plaintiff repeats and realleges all preceding paragraphs as though alleged here.

The relevant statute for the purpose of a section 1983 action  holds that: "Every person who, **under color of any statute, ordinance, regulation, custom, or usage**, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to **the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity**, or other proper proceeding for redress…"

The. Plaintiff has previously alleged in this complaint that the medical defendants were acting under color of law.

**AND AS FOR A SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

The Plaintiff repeats and realleges all preceding paragraphs as though alleged here.

The police in banging for hours on the Plaintiff's door for a putative wellness check and repeatedly calling the Plaintiff's cellphone and commanding him to "OPEN UP" sought to annoy the petitioner into responding to them, they could have texted him their putative purpose, slid a

note under the door, or even orally announced their purpose but did not do any of these but rather intentionally relied on intimidating tactics in an attempt to secure a response.

The Medical Defendants had prior confirmation of the Plaintiff's status as alive and lucid and intended to use the police as an instrumentality to cause him emotional distress in hopes that the Plaintiff would succumb to this distress, acquiesce, and go to the emergency room and more regularly attend dialysis treatment sessions.

The Medical defendants' action of calling the police was extreme because 1.) There were other less intrusive means of confirming the patients' health status, 2.) They had already made contact with the Plaintiff.

The NYPD used extreme actions like banging on the door for an extended period of time, using commanding tones and directly commanding him to "OPEN UP" hardly the words a reasonable person would expect from trained police officers making a first point of contact for a wellness check on a kidney patient. Indeed, the Plaintiff, repeated obviously unwanted phone calls that were reasonably calculated to induce distress and fear in the Plaintiff towards the end of getting

him to comply with the demands of Schwimmer and the NYPD, if the Plaintiff were dead, or unconscious, what was banging on the door, commanding him to "open up," and calling him repeatedly going to do to help the situation? Power and force are not persuasive, especially when used or employed surreptitiously without the patient's knowledge they are not persuasive but rather they are coercive and perhaps the NYPD would do well to remember that as they execute their myriad duties to the public.

If the Plaintiff were not home what would this 2–3-hour debacle have accomplished? Officers should not be excused for thoughtlessness like this.

The Plaintiff alleges that NYPD knew he was home and had reason to believe he was deliberately avoiding them as they had also confirmed with the building superintendent by having him show them video footage of the Plaintiff's apartment door over the past 24 hours to confirm whether or not the Plaintiff had left the premises in that time frame and had returned or not in the same timeframe and the Plaintiff had not.

Had the NYPD been gentler in its approach; considering it is visit was ostensibly for the purposes of a "wellness check" no possible intent to cause distress could be inferred. However, because the NYPD was exceedingly aggressive in conducting the "check" an intent to induce fear can be inferred.

**<u>AND AS FOR AN EIGHTH CAUSE OF ACTION AGAINST THE NYPD AIDING AND</u>**

**<u>ABETTING HARASSMENT</u>**

The Plaintiff repeats and realleges all preceding paragraphs as though alleged here.

## **AND AS FOR AN NINTH CAUSE OF ACTION DECLARATORY JUDGMENT**

The Plaintiff repeats and realleges all preceding paragraphs as though alleged here.

The Plaintiff seeks declaratory judgment that:

A.) The NYPD has a duty to conduct wellness checks in the least obtrusive and non-threatening manner possible, wherever possible and must announce to the subject of the putative wellness check that that is their purpose for engaging the subject.

B.) For the purposes of clarifying the Plaintiff's privacy rights, in the context of "wellness checks" declare that medical personnel when attempting to confirm a patient's wellness in the community have a duty to attempt to confirm a Patient's welfare by other reasonably available means, i.e. the least intrusive means prior to calling the police to do so, if they are unable to so

confirm after attempting to have done so or if there are no other available means to do so then they may call the police subject to other lawful exceptions.

C.) Declaring that a patient has the right to refuse unwanted medical treatment.

D.) That under the circumstances as alleged here that licensed Medical Personnel are state actors for the purposes of infringement upon constitutional rights when said medical personnel evince a coercive animus in restraining or attempting to restrain or causing a person to be restrained directly or indirectly in an unlawful manner or perform or accept or receive unwanted medical treatment.

E.) That the state may not disclose PHI in contravention of an established legal exception.

**WHEREFORE**, the Plaintiff prays this court for judgment and damages in amount to be determined at trial and such punitive damages allowable where available, and further for Declaratory Judgment declaring the items enumerated in the ninth cause of action, and the

NYPD when conducting a "wellness check" must announce to at least the subject of a "wellness check" that they are conducting a wellness check and for the other purposes specifically enumerated in this complaint

Dated: September 13th 2022            Respectfully submitted,

New York, NY.                        /s/: Tequan Doe

                                      Plaintiff Pro se